**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-CV-1820

PRESTON SOWL,

      Plaintiff,

v.

CITY OF LOVELAND, a municipality,
PAUL ASHE, Loveland Police Officer, in his individual capacity,
BENJAMIN DELIMA, Loveland Police Officer, in his individual capacity, and
CLINT SCHNORR, Loveland Police Detective, in his individual capacity,
BRIAN BARTNES, Loveland Police Sergeant, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Preston Sowl, by and through his attorney Sarah Schielke The Life & Liberty Law Office in Loveland, CO, respectfully alleges for his *Complaint and Jury Demand* as follows:

**I.   INTRODUCTION**

1.  On September 22, 2019, Defendant officer Paul Ashe of the Loveland Police Department beat up, arrested, and falsely charged Plaintiff Preston Sowl for the non-existent crime of "not talking to him." Defendant officers Benjamin DeLima and Clint Schnorr personally participated in these violations of Mr. Sowl's constitutional rights under the Fourth, Fourteenth and First Amendments to the U.S. Constitution. Defendant Bartnes, as a supervisor on scene, also failed to intervene, failed to report the unlawful use of excessive force, and then assisted Defendants Ashe and DeLima in attempting to cover up their misconduct. He also authorized the continued handcuffing of Mr. Sowl despite multiple requests from medical personnel to

remove the handcuffs from the injured Mr. Sowl. All Defendant officers' conduct revealed unconstitutional customs, practices and policies at Loveland Police Department as well as failures to train and supervise which were driving forces behind the officers' misconduct.

2. The Defendants' actions caused Plaintiff Mr. Sowl to endure shoulder blade fracture, complete shoulder dislocation (later requiring complete shoulder replacement surgery), multiple contusions on his head and body, false arrest, pain, permanent injury, suffering, humiliation, emotional distress, damage to his reputation, attorneys' fees, and other damages.

## II.  JURISDICTION AND VENUE

3. This action arises under the Constitution and laws of the United States and the State of Colorado, including Article III, section 1 of the United States Constitution and Title 42 U.S.C. § 1983.

4. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

5. This Court has authority to grant any declaratory relief requested herein pursuant to 28 U.S.C. § 2201.

6. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

## III. PARTIES

8. Plaintiff, Preston Sowl, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado. He resides in Loveland, Colorado.

9. Defendant Paul Ashe is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto Defendant Ashe was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Ashe is a named Defendant in his individual capacity.

10. Defendant Benjamin DeLima is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto Defendant DeLima was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer DeLima is a named Defendant in his individual capacity.

11. Defendant Detective Clint Schnorr is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto Defendant Schnorr was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Detective Schnorr is a named Defendant in his individual capacity.

12. Defendant Sergeant Brian Bartnes is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto Defendant Bartnes was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of

Colorado and the Constitution and laws of the United States of America. Sergeant Bartnes is a named Defendant in his individual capacity.

13. Defendant City of Loveland is a municipality for purposes of § 1983 liability.

### IV. FACTUAL ALLEGATIONS

14. Late in the afternoon of Sunday, September 22, 2019, Plaintiff Preston Sowl and his wife, Sherrie Nix, were leaving Charlie L's pub in downtown Loveland, Colorado. They briefly chatted with some friends and then walked to their parked car in the parking lot.

15. Ms. Nix began driving them out of the parking lot when they noticed that – blocking their exit from the lot – there was a motorcyclist laying under a downed motorcycle.

16. Ms. Nix parked, and both she and Mr. Sowl (along with several other bystanders in the parking lot) went over to the downed rider to help him.

17. Some of the other bystanders reached the motorcyclist first and they lifted the bike off of him in an effort to render aid. There was no damage to the bike but the motorcyclist was bleeding and his ankle was observably injured from the fall. Someone called 911. Mr. Sowl and his wife stood by watching. Some of the Samaritans began discussing driving the motorcyclist to the hospital. Mr. Sowl (and others) said that was not a good idea given the extent of the motorcyclist's injuries and that they should wait for an ambulance to come. The others agreed and shortly thereafter an ambulance arrived, along with two EMTs. A firetruck and Loveland Police car also arrived in quick succession. All 3 groups of first responders parked their vehicles in a manner that completely blocked the exit of the parking lot.

18. The EMTs brought out a stretcher, seated the motorcyclist on it and began providing him medical care. Mr. Sowl and his wife (without much alternative, as their only exit to leave the one-way lot was blocked), stood by, several feet away, continuing to watch.

4

19. Defendant Officer Paul Ashe of the Loveland Police Department arrived and inserted himself into the scene. His actions were captured on various video recordings, to include Defendant Ashe's bodyworn camera, which is attached hereto as Conventionally Submitted **Exhibit 1**.

20. Officer Ashe marched up to the group of bystanders that were looking on from several feet off as the motorcyclist was receiving medical care. Mr. Sowl was standing farthest away and Officer Ashe approached him directly first. He said: "Where is the bike at?" Mr. Sowl pointed to where the bike was parked and replied, "The bike's parked down by the side." Officer Ashe, who had already seen the bike, and in fact had just walked past it, said "the blue one?" And Mr. Sowl said "yeah, the blue one there, we pulled it off."

21. Officer Ashe then said: "Ok. Do you mind coming and talking to me?"

22. Mr. Sowl replied: "I don't know what happened." Officer Ashe said, "Well, you pulled the bike off." Mr. Sowl shook his head. "I'm not talking to nobody."

23. Officer Ashe instantly got angry with Mr. Sowl. "*Really*?" He responded, raising his voice. Mr. Sowl, remaining calm, and pointing to the other witnesses, replied: "These guys saw what happened, I didn't." Mr. Sowl took a few steps back to further indicate that he was exercising his right to terminate the encounter.

24. Officer Ashe, undeterred, decided that he would not permit Mr. Sowl to terminate the encounter. He decided that, instead, he would escalate things and antagonize Mr. Sowl. "Ok, well if you're not talking to anybody, you can leave," he sneered at Mr. Sowl. Mr. Sowl was shocked and surprised by Ashe's sudden and unprovoked rudeness. Mr. Sowl responded: "*You* can leave. You're dismissed. I *can't* leave." He pointed to his wife's car, blocked in by the stretcher and emergency vehicles. Simultaneously, other bystanders on scene also pointed this out to Officer Ashe – reiterating "we *can't* leave." Indeed they were plainly all blocked into

the one-way lot by the stretcher and 4 emergency vehicles (which now also included Officer Ashe's patrol car).

25. Relentless, Officer Ashe decided he would attempt to intimidate and unlawfully order Mr. Sowl into answering his questions. "Ok, then come and talk to me," he again demanded of Mr. Sowl. Mr. Sowl shook his head and continued stepping back and away from Officer Ashe. "No," Mr. Sowl said, "I'm not going to come talk to you. I'm not going to come talk to you."

26. Meanwhile, multiple other first responders were accumulating on scene, creating a crowd of spectators. Officer Ashe, feeling embarrassed that Mr. Sowl was not cowing to his authority in front of his colleagues, decided that rather than leaving Mr. Sowl alone, he would instead double down on intimidating and harassing him. He pursued Mr. Sowl across the lot. "Did you pull the bike off of him?" he asked. "Did you pull the bike off of him??"

27. "No," said Mr. Sowl, "I did not." He continued walking away from Officer Ashe. "Ok, then you're free to leave!" Officer Ashe again snarled at Mr. Sowl. "You're free to leave!" Mr. Sowl retorted.

28. Officer Ashe walked a few steps away and began talking to another bystander witness, Ryan Trullinger. It was clear that this other witness had seen what happened with the motorcyclist and the bike, and was waiting to answer any questions that Ashe might have for him about what had occurred. He started to speak, but Officer Ashe immediately cut him off. "What's his name??" Ashe demanded of Mr. Trullinger, while pointing at Mr. Sowl.

29. "Uhh, Preston, is all I know," Trullinger responded. "Preston what??" Ashe demanded. Mr. Trullinger, justifiably not understanding why Officer Ashe was ignoring him and was instead completely preoccupied with Mr. Sowl, responded awkwardly: "Umm… Preston is all I know."

30. Officer Ashe, now indeed fully ignoring the witness with actual information who was willing to be interviewed, and still fixated on Mr. Sowl (who, it should be noted, was a 60-year-old disabled man with a prosthetic eye, wearing just a muscle tank and gym shorts and standing fifteen feet away bothering no one and just looking at his cell phone), yelled across the lot at him: "You got an ID on you, boss??"

31. "Nope, no ID," Mr. Sowl responded, looking up from his phone and shaking his head.

32. "I'm gonna need your ID now," Ashe demanded, still yelling across the lot. "Nope," Mr. Sowl responded, continuing to look at his phone.

33. Officer Ashe called over his radio that he had an "uncooperative witness." He then abandoned the *actual* eyewitness he was supposed to be interviewing (Mr. Trullinger), and instead marched back up to Mr. Sowl, getting in his face. "Come on over here," he said to Mr. Sowl. Mr. Sowl backed away from Officer Ashe, again making it very clear he was done with the encounter. "It's my constitutional right," Sowl said, "it's my constitutional right."

34. Officer Ashe continued moving in towards Mr. Sowl, repeatedly closing the distance that Mr. Sowl was trying to create between them. "I want to talk to you. I need to talk to you," Ashe demanded.

35. Mr. Sowl, again, responded: "I don't want to talk to you." The exchange then went as follows:

    ASHE:    You have to talk to me.

    SOWL:    Nope. No, I don't.

    ASHE:    You do, ok.

    SOWL:    No, I don't.

    ASHE:    You inserted yourself.

    SOWL:    I came down here to help them, and I don't have to talk to anybody.

ASHE:      This can go one of two ways.

SOWL:      I don't have to talk to anybody.

ASHE:      Yes, you do.

SOWL:      I don't have to talk to anybody.

**ASHE:      Either you're going to stand here and talk to me-**

**SOWL:      Nope.**

**ASHE:      And have a short conversation-**

**SOWL:      Nope.**

**ASHE:      Or I can arrest you for obstruction.**

SOWL:      No you're not, I'm not obstructing-

ASHE:      You are.

SOWL:      You're right here, and I'm not obstructing nothing. These guys [*gesturing at the rest of police and medical personnel who were tending to the single injured motorcyclist*] are taking care of it.

ASHE:      Please just come talk to me.

SOWL:      Nope.

ASHE:      Ok, turn around.

SOWL:      I don't want to talk to you.

ASHE:      Turn around right now.

SOWL:      Nope, nope.

36. Officer Ashe at this point then grabbed Mr. Sowl's left arm. "Turn around," he said again. "No, you're wrong!" Mr. Sowl replied. Officer Ashe tightened his grip on Mr. Sowl's arm. "Turn

around!" he repeated. "It's my constitutional right!" Mr. Sowl responded. "I don't have to talk to you, and I don't have to ID myself!"

37. Preston Sowl was absolutely correct.

38. Defendant Officer DeLima and Defendant Detective Clint Schnorr, looking on, decided they would assist Officer Ashe in punishing Mr. Sowl for his refusal to talk. Both charged in. Officer Ashe began twisting Mr. Sowl's left wrist and arm painfully backwards behind him. Mr. Sowl, horrified and shocked, yelled, "what are you – what are you fucking with me for?!" Before he could finish the question, all three officers grabbed the rest of Mr. Sowl (to include his other arm, which had been at his side, and his body) and they all simultaneously tackled Mr. Sowl to the pavement, twisting both of his arms behind him as they went. "OW!!!" Mr. Sowl screamed. "This is fucked up! Ow!! What are you doing?! I had nothing to do with this!" Officers Ashe, DeLima and Detective Schnorr all then climbed atop Mr. Sowl, continuing to twist his arms behind him, locking handcuffs onto his wrists, and compounding Mr. Sowl's pain, shock, terror and horror, causing him more injury.

39. The three then, using Mr. Sowl's handcuffed wrists, pulled him up to his feet without warning, greatly exacerbating the injury and pain to his now dislocated shoulder. As they did it, Mr. Sowl screamed, "OWWW MY SHOULDER IS FUCKED UP!!"

40. Mr. Sowl's shoulder was observably dislocated. It was also fractured. His rotator cuff was torn and his collarbone also fractured. He was in extraordinary pain. He would eventually be taken to the hospital where doctors were unable to put his shoulder back into the socket, causing him to have to continue to endure excruciating, tearing pain. In the months that followed, he would have to have complete shoulder replacement surgery, as a result of the officers' assault.

41. As Mr. Sowl continued screaming in pain, bleeding from his head, arms and legs, and with his shoulder destroyed, Officer Ashe coyly commented, "**I told you. I told you. I gave you plenty of opportunities. Allllll you had to do is talk to me**."

42. The officers then walked the handcuffed and bleeding Mr. Sowl over to the back of a police patrol vehicle. "All you had to do is talk to me," Ashe repeated. "I didn't want to talk to you, I didn't have to talk to you," Mr. Sowl responded. "Doesn't matter," Ashe replied. Then the following exchange occurred:

SOWL: I didn't have to talk to you. I don't know what happened, we came over, we saw him down, I came to help him get his fucking bike up-

ASHE: Ok, and that's what I needed to talk about.

SOWL: That's right-

ASHE: So if you inserted yourself-

SOWL: And you uncuff me and you fucking let me go-

ASHE: If you inserted yourself, you need to talk to me.

SOWL: I don't need to talk to you!

**ASHE:** **You are obstructing an investigation.**

SOWL: I'm not obstructing anything!

**ASHE:** **You are under arrest for obstruction, and now, for resisting.**

43. The criminal offense of Obstructing a Peace Officer is defined by § 18-8-104(1)(a) of the Colorado Revised Statutes as follows:

> "A person commits obstructing a peace officer … when, by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstruct, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority."

44. In 2005, the Colorado Supreme Court in *Dempsey v. People*, 117 P.3d 800, 810-11 (Colo. 2005) made clear that in the obstruction statute: "The obstacle or physical interference may not be merely verbal opposition." Furthermore, the Court noted, "mere remonstration does not constitute obstruction." *Id.* at 811. "[M]ere verbal opposition" to the police does not suffice; instead "a combination of statements and acts by the defendant, including threats of physical interference or interposition of an obstacle," is required. *Id.*

45. In 2012, in the case of *Kaufman v. Higgs*, 697 F.3d 1297 (10th Cir. 2012), the Tenth Circuit Court of Appeals addressed qualified immunity claims made by officers in a § 1983 lawsuit filed against police by Mr. Kaufman after police arrested him for Obstruction solely due to his refusal to answer questions regarding an investigation. The Tenth Circuit ruled that "[n]o reasonable officer could have construed Colorado's obstruction statute as criminalizing the choice to remain silent when faced with questions the answers to which might be incriminating." *Id.* at 1302. The Court denied the officers qualified immunity, found the right to be free from such wrongful arrest clearly established, and also reiterated that there could not even be "arguable probable cause" in such a scenario. *Id.* ("[T]he Colorado Supreme Court ha[s] made it clear that the Colorado obstruction statute is not violated by mere verbal opposition to an officer's questioning.").

46. As such it was abundantly clear to any reasonable officer on scene that Mr. Sowl had not committed the offense of obstruction by refusing to talk to Officer Ashe. Quite to the contrary, it was clearly established and abundantly obvious to any reasonable officer that Mr. Sowl could *not* be arrested for obstruction for remaining silent.

47. Before walking him to a patrol car, Officers DeLima and Ashe then – for no good reason – tightened Mr. Sowl's already tight handcuffs, causing him more pain.

48. They then forced him into a patrol car, while he was still injured, bleeding and in handcuffs, and complaining of terrible, searing pain in his shoulder.

49. Officer Ashe then started walking around the parking lot telling witnesses that all Mr. Sowl needed to do to avoid being arrested was to have "talked to [him] for two seconds." He stated several times to both fellow officers and witnesses that he (Ashe) was "trying to figure out what happened" and "so I do need to talk to him and so at that point in time he does need to talk to me, ok."

50. Officer Ashe loudly made these statements to both bystanders and fellow officers on scene, which included Officer DeLima and his supervisor, Sergeant Bartnes. Every Loveland Police officer agreed with Officer Ashe's plain misstatement of the law. This revealed either: (1) an unconstitutional custom/policy/practice of arresting citizens for not speaking to police, or otherwise coercing them to do so; or (2) a failure to properly train and supervise its officers with respect to the law in this regard, causing the civil rights violations to Mr. Sowl; or both.

51. Officer Ashe, still furious with Mr. Sowl for having had the audacity to defy his unlawful orders, told Mr. Sowl he was "going to jail," despite Mr. Sowl's observable injuries and need for immediate medical care. Mr. Sowl was in shock. He could not believe that the half dozen police officers on scene were condoning and personally assisting Officers Ashe, DeLima and Schnorr in beating him up and falsely arresting him. The officers shut Mr. Sowl in the car, still bleeding and with a dislocated shoulder made worse by handcuffed arms, in extreme pain.

52. Officer Ashe then went over to the group of now at least 5 Loveland Police Officers congregating around on scene and began discussing how they would explain their attack on

Mr. Sowl. Six minutes went by. A paramedic (Shane) who had already been there for quite a while, and who had already previously noticed Mr. Sowl's contorted shoulder, walked up to the group of officers and proposed that maybe they should at least let the on-scene medical personnel take a look at Mr. Sowl's injuries. The officers sighed and said fine.

53. Officer Ashe then walked back to his patrol car, opened the door, and told Mr. Sowl that a paramedic was going to look at his injuries. Mr. Sowl, desperate for medical care and in tremendous pain, eagerly and enthusiastically approved of that plan. He again reiterated that his shoulder was "all fucked up" and that there was "no reason" for the officers to have thrown him to the ground like that. Officer Ashe, shamelessly, insisted to Mr. Sowl that he had given him "plenty of chances" to talk to him and that because Mr. Sowl "didn't talk" to him, "you put yourself under arrest."

54. Mr. Sowl begged for any one of the Loveland police officers on scene to take his hands out of the handcuffs because of how much worse it was making the pain from his dislocated and fractured shoulder. Officer Ashe ignored him, walked away, and muted his microphone so that Mr. Sowl's complaints would not be documented further.

55. Paramedic Shane could instantly tell that Mr. Sowl had a dislocated shoulder, and possibly worse (his suspicions were correct, as Mr. Sowl's rotator cuff was torn and the shoulder fractured, too). Paramedic Shane then stated directly to Officer Ashe: "his shoulder might be **out**" and Officer Ashe smirked and agreed, replying, "oh yeah, there's a decent chance."

56. Paramedic Shane stated to Officers Ashe, DeLima, Schnorr and Bartnes that Mr. Sowl needed to go to the hospital in the ambulance. The Officers declined the ambulance and told the paramedic that Mr. Sowl would go to the hospital in their custody, in handcuffs.

57. Still leaving him suffering handcuffed in the vehicle, Officer Ashe then went up to Mr. Sowl's wife and told her that Mr. Sowl would be transported to the hospital and then the jail where he would be "booked in for obstructing and resisting." Mr. Sowl's wife shook her head. Officer Ashe, in response, again stated "I mean, a few seconds, if he would have talked to me, we would have been done."

58. In continuing to talk with other people and officers on scene, Officer Ashe, referring to Mr. Sowl, stated that what Mr. Sowl had done were "both misdemeanors" and that there were "no felony charges or anything like that" and that "if he would have just talked to me for two seconds, you know, it would have been over."

59. The Defendant officers continued to leave Mr. Sowl and his dislocated shoulder painfully handcuffed inside their patrol car and then took their time walking around the parking lot, talking and examining the motorcycle for damage (there was none). Mr. Sowl remained in terrible pain inside the car and continued to bleed.

60. Mr. Sowl continued to complain about the pain his handcuffed arms were in, given the fact that – among other injuries – his shoulder was quite dislocated. The officers refused to remove his handcuffs. Meanwhile, during this post-arrest 10-minute period, Paramedic Shane walked around, from officer to officer, asking them (at least 3 times) to remove the handcuffs from the injured Mr. Sowl. One officer, Officer Noble, finally went and asked the on-scene Sergeant (Defendant Sergeant Bartnes) if they could remove the handcuffs to alleviate Mr. Sowl's pain and permit the paramedics to begin providing him with actual medical care. Sergeant Bartnes said no.

61. Finally, nearly 20 minutes after the injuries had occurred, a different supervising officer (another sergeant) came and undid Mr. Sowl's handcuffs so that the paramedics and an on-

scene firefighter could examine and begin providing medical care to his arm and shoulder. Mr. Sowl begged for things to be sped up so that he could get actual medical treatment at the hospital, telling the officers and firefighters he was in extreme pain, his hand was going numb, and that he could no longer bear it. "Whichever hospital is closest!" he pleaded with them, "just take me there." Ignoring him, Officer Ashe walked up to Loveland PD officer Zach Merson and they smirked at each other, taking observable outward pleasure in the pain Mr. Sowl was in. Officer Merson smiled and said "*simple question,*" referencing Ashe's and the rest of the officers' belief that Mr. Sowl got what he deserved for refusing to be questioned.

62. Loveland Assistant Police Chief Tim Brown arrived on scene. He walked up to Officer DeLima and prompted him to mute his body camera so they could discuss how to handle the group's attack and false arrest of Mr. Sowl, given his unconcealable injuries.

63. Shortly after, and as a group, all the Loveland police officers on scene un-muted their body cameras and began marching around claiming that Mr. Sowl's statement of "we pulled it off him" with respect to the bike that had been crushing the injured motorist meant they could have also arrested Mr. Sowl for the felony offense of Tampering with Physical Evidence.

64. The crime of Tampering with Physical Evidence is defined by § 18-8-610 of the Colorado Revised Statutes as follows:

> "A person commits tampering with physical evidence if, believing that an official proceeding is pending or about to be instituted and acting without legal right or authority, he … destroys, mutilates, conceals, removes, or alters physical evidence with intent to impair its verity or availability in the pending or prospective official proceeding."

65. Like Obstruction, Tampering with Physical Evidence has absolutely no application to the facts here. A Good Samaritan cannot be charged with felony Tampering for attempting to render aid

to an injured motorist. Indeed, a Good Samaritan cannot even be *civilly* charged in Colorado for attempting to render aid to an injured motorist.

66. There was also, naturally, not even a remote suggestion of an "official proceeding" in the case of the motorcyclist at the time the bystanders attempted to render him aid. There was nothing more than a guy in a parking lot being crushed under the weight of his own motorcycle. Mr. Sowl was one member of a group of bystander good Samaritans who attempted to render aid. This after-the-fact probable cause idea concocted by the Loveland PD that any of the good Samaritans could have been charged with a felony crime for having done so is, and was, objectively ludicrous.

67. Other witnesses on scene, it ought to be noted, openly admitted to having picked the bike up off the motorist. One on-scene witness (Jason Tomlin) repeatedly explained to all the officers on scene that after getting the bike off the motorist, he then personally parked the bike next to the building so that it wouldn't be towed. Not shockingly, none of these witnesses were charged with Tampering with Physical Evidence.

68. Beyond the psychological trauma, humiliation, desecration of his rights as a citizen and human, and emotional injury, Mr. Sowl also suffered plenary physical injuries at the hands of the Defendants. He had a fractured shoulder. A dislocated shoulder. A torn rotator cuff. Also:

16

a.   He suffered abrasions and contusions to his head.



b.   His knee was scraped off in several places (both inside and out) and began to swell and

bruise.

   

c.   His left arm was scraped, bloodied and bruised in several locations.



69. At the hospital, Defendant Officer Ashe waited around while Mr. Sowl received medical care, eager to take Mr. Sowl to jail. Medical staff had to inform Ashe repeatedly that there was no way Mr. Sowl could be transported to jail given his injuries.

70. Deflated, Officer Ashe then wrote Mr. Sowl a citation charging him with Obstruction of a Peace Officer and Resisting Arrest and left.

71. The Larimer County District Attorney's Office subsequently dismissed both charges that Officer Ashe had wrongly filed against Mr. Sowl.

72. Plaintiff was injured financially, in the expenses for his legal defense, through medical expenses, in lost time and income, as a result of the Defendants' unlawful conduct.

73. Plaintiff experienced physical pain, trauma and suffering as a result of the Defendants' unlawful conduct and violations of his civil rights.

74. Plaintiff also suffered impairment of reputation, personal humiliation, mental anguish, and suffering by virtue of the unlawful actions of these Defendants as set forth herein, for which he is entitled to compensation.

75. Upon information and belief, Officer Ashe has had numerous issues with, and citizen complaints of, excessive force since joining the Loveland Police Department in 2012.

76. Upon information and belief, Officer DeLima also has had numerous issues with and citizen complaints of excessive force since joining the Loveland Police Department. Like Officer Ashe, he also been involved in a disproportionately high number of incidents involving use of force and shooting at citizens. Officer DeLima has also been involved in repeated instances of tackling citizens in that same parking lot where he tackled Mr. Sowl. He admitted as much on video, when he commented to a supervisor how he "hates fighting in this parking lot."

77. Upon information and belief, Detective Clint Schnorr had numerous issues with and citizen complaints of excessive force and credibility issues at the CSU Police Department – known to Loveland Police Department – prior to Loveland hiring him.

78. Loveland Police Department has a pattern and policy of retaliatory arrests, police brutality, failures to de-escalate, and using excessive force on civilians.

79. Loveland has failed to train and supervise its officers regarding citizens' constitutional right to refuse to submit to questioning. Nowhere in any of Loveland's training materials or official policies and procedures is even a sentence provided that instructs or trains officers regarding citizens' constitutional right to refuse to submit to questioning.

80. To the contrary, Loveland has a formal written policy directing its officers that they "may conduct field interviews with a subject's consent or when reasonable suspicion or probable cause exists." This trains its officers to believe (incorrectly) that they may force a citizen to submit to questioning so long as they have either consent, reasonable suspicion, or probable cause. This policy is unconstitutional. Every citizen has the right to refuse to be questioned. Police officers do not have the absolute discretion to decide who they can force to submit to a field interview.

81. All of the Defendants' actions as described herein were taken under color of state law.

82. Mr. Sowl suffered extreme pain in his shoulder and arm, including acute nerve pain and bouts of numbness, for 10 months while awaiting shoulder replacement surgery. His range of movement in the arm and shoulder was permanently disabled. He was traumatized and the constant pain in his shoulder constantly reminds him of the terrible violation of his person and security that the Defendants put him through. He was unable to sleep due to the pain and trauma. He continues to be in discomfort and struggle with anxiety and sleep due to this event.

83. Prior to this incident, Mr. Sowl felt comfortable exercising his rights as a citizen, to include his basic First Amendment right to decide when and to whom he spoke. Following this incident, Mr. Sowl is afraid of police and afraid to exercise his rights. This change in Mr. Sowl's life experience has been particularly devastating for him because Mr. Sowl's father was a Boulder police officer for 22 years. Mr. Sowl previously had great respect for law enforcement. He felt great pride in being an American with constitutional rights in a free society. All of that was stripped of him in this incident. He can never get it back. He will never be able to trust police again. He will never be able to fully believe that his constitutional rights are guaranteed to him again. Now, still living in Loveland, every time he sees a police officer or police car, he feels sick.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 1st and 4th[1] Amendment Violation – Retaliatory Arrest*
(against Defendant Ashe)

84. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

85. The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. Refusing to be questioned is constitutionally protected speech.

86. At the time Officer Ashe grabbed Mr. Sowl to arrest him, there was not probable cause to arrest Mr. Sowl for any crime.

---

[1] There was some confusion prior to the U.S. Supreme Court's 2019 decision in *Nieves v. Bartlett* regarding whether retaliatory arrest claims like Mr. Sowl's ought to be brought under the 1st or 4th  Amendment in the § 1983 context; *Nieves* seems to have soundly resolved this query in favor of the claim being brought pursuant to the 1st Amendment. To any extent that Defendant Ashe may attempt to claim that it did not, however, Mr. Sowl then also brings this claim under the 4th Amendment.

87. Officer Ashe's arrest of Mr. Sowl was objectively unreasonable.

88. Further, to any extent that the Defendant Officers may argue that there was probable cause of some other offense besides Obstruction (like the Tampering scheme they attempted to proffer later), there is objective evidence that Mr. Sowl was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech as him were not. Namely, if the offense for which Defendants later attempt to justify Mr. Sowl's arrest is Tampering or anything else related to moving the bike off the injured motorist, then the multiple witnesses on scene who openly admitted to personally moving the bike ought to have also been arrested. They, of course, were not, because the purpose of Officer Ashe's arrest of Mr. Sowl was entirely retaliatory.

89. Defendant Officer Ashe decided to arrest Mr. Sowl in retaliation for his refusal to submit to his questioning. This is more than abundantly apparent by virtue of all the statements Officer Ashe made after arresting Mr. Sowl, to include but not limited to: "I told you. I told you. I gave you plenty of opportunities. Allllll you had to do is talk to me," and "All you had to do is talk to me," and "That's what happens when you don't cooperate," and "Well, I gave you plenty of chances, you put yourself under arrest."

90. Officer Ashe's arrest of Mr. Sowl, as demonstrated by his statements to him before and after the arrest, arose purely out of Ashe's retaliatory animus in response to Mr. Sowl's exercise of his constitutionally protected right to not be forcibly questioned.

91. The U.S. Supreme Court case of *Nieves v. Bartlett*, 587 U.S. _____ (2019) was decided on May 28, 2019. *Nieves* ruled that the "no-probable-cause requirement [for retaliatory arrest claims to proceed] should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech

had not been." *Id.* at 14. This occurred on September 22, 2019. Beyond how facially ineffectual such an effort would be, as a result of the clear law set forth in *Nieves*, Defendant Ashe nevertheless literally cannot hide behind the defense of arguable probable cause with respect to Mr. Sowl's retaliatory arrest claim.

92. Somewhat comically, Defendant Officer Ashe also completely foreclosed such a defense to Mr. Sowl's retaliatory arrest claim in his own written report. In his report, Defendant Officer Ashe writes: "I chose not to charge Preston with Tampering with Evidence. I felt that if I charged him, I would also have to charge Sherry, Jason, and Ryan and that would not be fair to them because they all cooperated with the investigation."

93. Mr. Sowl suffered injuries and damages as already set forth in this complaint as the proximate result of Officer Ashe's retaliatory arrest, to include, but not limited to: pain, suffering, a dislocated shoulder, embarrassment, invasion of security, attorneys fees, psychological trauma, and medical bills.

**SECOND CLAIM FOR RELIEF**
***False Arrest/Imprisonment – 4th Amendment - (Arrest w/o Warrant or Probable Cause)***
(against Defendants Ashe, DeLima & Schnorr)

94. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

95. When Defendant Ashe suddenly and without warning grabbed Mr. Sowl's arm, twisted it backwards using a painful rear wristlock maneuver, and then tackled him to the ground to arrest him, he effected a warrantless seizure and arrest of Mr. Sowl, without probable cause (or even reasonable suspicion) for such seizure, in violation of the Fourth Amendment.

96. When Defendant DeLima, observing Defendant Ashe begin to make an illegal seizure and false arrest of Mr. Sowl, ran up and joined in by grabbing Mr. Sowl's other arm and also

22

tackling him to the ground, he also effected a warrantless seizure and arrest of Mr. Sowl, in violation of the Fourth Amendment.

97. When Defendant Schnorr, observing Defendant Ashe begin to make an illegal seizure and false arrest of Mr. Sowl, ran up and joined in by grabbing Mr. Sowl's other arm and also tackling him to the ground, he also effected a warrantless seizure and arrest of Mr. Sowl, in violation of the Fourth Amendment.

98. All three Defendants knew that Mr. Sowl had committed no arrestable offense, and that he possessed no probable cause for any criminal offense, that Defendant Ashe was effecting a retaliatory arrest, and yet they all arrested and unlawfully seized Mr. Sowl anyway, with deliberate indifference to Mr. Sowl's rights under the Fourth Amendment to the U.S. Constitution.

99. The Defendants' sudden seizure and assault of Mr. Sowl caused him to experience great physical pain and terror, along with a dislocated shoulder, fractured shoulder, fractured collar bone and other injuries as detailed herein. The experience of this event caused and continues to cause Mr. Sowl pain, trauma, and emotional distress.

**THIRD CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 4th Amendment Violation – Excessive Force*
(against Defendants Ashe, DeLima, Schnorr & Bartnes)

100.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

101.   When Defendants Ashe, DeLima and Schnorr suddenly and without warning grabbed Mr. Sowl's body and arms, twisted his arms backwards using a painful rear wristlock maneuver, handcuffed him, slammed his head and body into the pavement, and then continued twisting

his dislocated arm while he was handcuffed and bleeding on the ground, this was an assault upon Mr. Sowl's person, employing excessive force, in violation of the Fourth Amendment.

102.    No officer would consider the Defendants' sudden and unannounced deployment of painful force upon Mr. Sowl to have been reasonable or justified under the circumstances.

103.    The Defendants then kept the observably injured Mr. Sowl in handcuffs – denied medical care – and in excruciating pain. There was no reasonable purpose for this continued excessive force and abuse.

104.    Sergeant Bartnes, the on-scene supervisor, personally participated in the Defendant officers continued use of excessive and painful force on Mr. Sowl when he refused paramedic Shane's request to remove Mr. Sowl's handcuffs to alleviate his suffering and provide him with necessary medical care. Sergeant Bartnes had a duty to intervene and to supervise his subordinates on scene and instead of fulfilling those duties, he personally participated in and authorized the continuation of the deployment of painful excessive force on Mr. Sowl. This made Mr. Sowl needlessly and unreasonably suffer longer than necessary and exacerbated the extend and degree of his tendon injuries.

105.    Defendants Ashe, DeLima, Schnorr and Bartnes effected their assault and these injuries to Mr. Sowl with deliberate indifference to Mr. Sowl's rights under the Fourth Amendment to the U.S. Constitution.

106.    Defendants' assault on Mr. Sowl caused him to experience great physical pain and terror, degradation of personal security, excruciating continued strain to his torn tendons, anxiety and trauma, along with the other injuries set forth herein.

**FOURTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Deliberately Indifferent Policies, Practices, Customs, Training,*
*Supervision and Ratification, Unconstitutional Policy – Violation of 14th Amendment*
(against Defendant City of Loveland)

107.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

herein.

108.    Loveland has failed to train and supervise its officers regarding citizens' constitutional First

Amendment rights, including but not limited to every citizen's right to refuse to submit to

questioning. Nowhere in any of Loveland's training materials or official policies and

procedures is even a sentence provided that instructs or trains officers regarding citizens'

constitutional right to refuse to submit to questioning. This failure to train is deliberately

indifferent to the First Amendment rights of citizens like Mr. Sowl, and made it both

foreseeable and likely that Loveland Police officers would violate First Amendment rights of

individuals like Mr. Sowl.

109.    In addition to this deliberately indifferent failure to train, Loveland also has a formal

written policy directing its officers that they "may conduct field interviews with a subject's

consent or when reasonable suspicion or probable cause exists." This trains its officers to

believe (incorrectly) that they may force a citizen to submit to questioning so long as they have

either consent, reasonable suspicion, or probable cause. This policy is unconstitutional. Every

citizen has the right to refuse to be questioned. Police officers do not have the absolute

discretion to decide who they can force to submit to a field interview.

110.    Because of Defendant Loveland's failure to train and supervise its officers regarding the

rights of citizens to be free of forced/coerced questioning by its officers, and because

Defendant Loveland also trained its officers that it could charge citizens with crimes for the

25

exercise of their First Amendment rights, individuals like Mr. Sowl have been repeatedly subjected to violations of their constitutional rights.

111.    Defendant Ashe acted as he did pursuant to and because of the policies and training of Defendant Loveland.

112.    Defendant Loveland knew to a moral certainty that occasions would arise when Loveland citizens would not want to be subjected to police questioning. Despite this, Loveland failed to train its officers on the constitutional limitations of the use of arrests and violent force on such citizens. Instead, it issued a one-sentence policy that illegally authorized to question anyone they wanted with absolutely no training or guidance provided whatsoever regarding a citizen's right to refuse to be questioned even in situations where there was reasonable suspicion or probable cause.

113.    Defendant Loveland also failed to train its officers that a citizen could never be arrested for merely refusing questioning, and instead, as stated already herein, encouraged its officers to forcibly question whomever they wanted. This reality was made abundantly apparent by the fact that Defendant Ashe, who knew he was on video (and who himself pointed it out on the recording), told Mr. Sowl (repeatedly) that Mr. Sowl could either submit to questioning "or be arrested for obstruction."

114.    Defendant Loveland plainly also has failed to train its officers regarding the law and constitutional limitations of a citizen exercising his or her right to remain silent, and the fact that that absolutely cannot be criminalized. As a result of this failure to train (and apparent open policy endorsing the same), Defendant officer Ashe believed he could use the Obstruction statute to criminalize and arrest citizens for exercising their constitutionally-protected right to refuse police questioning.

115.    Defendant Loveland's formal policy informing its officers they could question anyone they
wanted with consent, reasonable suspicion or probable cause (without limitation or direction
regarding the citizen's right to refuse that questioning) was a moving force and proximate
cause of the Individual Defendants' violations of Mr. Sowl's rights.

116.    Defendant Loveland has persistently failed to investigate and counsel or discipline
Loveland PD officers for their similar abuses of power in forcibly questioning individuals and
arresting any who do not cow to their lawless coercion. Further, Defendant Loveland's
supervisory officers, to include but not limited to the various supervisory personnel that arrived
on scene in this case, have a custom and practice of encouraging, tolerating and ratifying such
blatantly illegal conduct. These encouragements, toleration of, and ratifications reveal that
Loveland PD officers carry out such police misconduct under the policies and regiment of
training provided by Loveland, and that such conduct is customary within Loveland PD.

117.    Indeed the behavior of the half dozen Loveland PD officers on scene after Mr. Sowl was
illegally arrested and subjected to excessive force confirms the practice and custom within
Loveland PD to violently arrest anyone who they don't like, regardless of lacking legal
justification for the same. The cover-up effort that followed Mr. Sowl's arrest involving all the
on-scene officers discussing the idea of claiming he had committed Tampering with Evidence
in order to justify their illegal arrest and completely excessive force upon Mr. Sowl reveals
that this unconstitutional retaliatory practice is endemic to Loveland as an institution.

118.    Loveland is responsible for training its officers to ensure they perform their duties
consistent with the law and to discipline their improper conduct, so officers can learn from
their experiences and be deterred from engaging in future misconduct that violates the
constitutional rights of people with whom the police interact. Loveland's failure to do so has

communicated to, and trained, LPD officers, including Defendants Ashe, DeLima and Schnorr, that excessive force against anyone who is not verbally cooperating is authorized and tacitly (or explicitly) encouraged. The failure to counsel or discipline misconduct constitutes training which causes future similar unconstitutional conduct.

119.    Loveland's past ratification and toleration of similar unconstitutional conduct thus caused and was the moving force behind the Individual Defendants' use of excessive force against Mr. Sowl, and Loveland's failure to discipline the Individual Defendants for this retaliatory arrest and illegal use of force will lead to more unconstitutional conduct.

120.    Defendant Loveland's acts and omissions caused Mr. Sowl damages in suffering physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy and sense of security and individual dignity, among other injuries, damages and losses.

121.    Defendant Loveland's actions, as described, deprived Mr. Sowl of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

### FIFTH CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Violation of Fourth Amendment – Malicious Prosecution*
(against Defendant Ashe)

122.    Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

123.    Defendant Ashe caused Mr. Sowl's continued confinement in handcuffs and in the patrol car and at the hospital with his unconstitutional malicious actions. Defendant Ashe also knowingly filed unsupportable criminal charges against Mr. Sowl, out of pure malice against Mr. Sowl.

124.    In fact, no probable cause supported the original arrest of Mr. Sowl, a fact that was plainly known to Defendant Ashe.

125.    Defendant Ashe caused the criminal prosecution against Mr. Sowl by issuing Mr. Sowl an unlawful criminal citation, writing an untruthful report, and thereafter providing it to the District Attorney.

126.    Defendant Ashe's unlawful actions and false allegations against Mr. Sowl were the sole moving force behind the criminal prosecution against Mr. Sowl. The District Attorney's Office prosecuted Mr. Sowl (albeit only briefly) solely because of the false and lawless claims made by Defendant Ashe in these official documents.

127.    Defendant Ashe concealed and misrepresented facts, as well as outright lied, in his account of the evening he arrested Mr. Sowl, in order to ensure Mr. Sowl's suffering continued beyond his physical injuries and into the courtroom following release from the hospital.

128.    Defendant Ashe's actions were done with malice.

129.    No probable cause supported the original arrest, continued confinement, or prosecution of Mr. Ashe.

130.    The criminal prosecution initiated and continued by the malicious, deliberate actions of Defendant Ashe resolved in favor of Plaintiff Mr. Sowl when on January 14, 2020, the Larimer County District Attorney's Office dismissed all charges in the case.

131.    Defendant Ashe's conduct proximately caused significant injuries, damages, and losses to Mr. Sowl.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mr. Sowl respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

a.    A handwritten apology from each of the Defendant officers;

b.    Appropriate declaratory and other injunctive and/or equitable relief;

c.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

d.  All economic losses on all claims allowed by law;

e.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

f.  Attorneys' fees and the costs associated with this action on all claims allowed by law;

g.  Pre- and post-judgment interest at the lawful rate; and

h.  Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 22nd day of June, 2020.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com